ASSOCIATION OF NEW JERSEY STATE COLLEGE FACULTIES, INC., A NEW JERSEY CORPORATION, *ET AL.*, PLAINTIFFS-APPELLANTS, v. RALPH A. DUNGAN AS CHANCELLOR OF HIGHER EDUCATION AND INDIVIDUALLY, *ET AL.*, DEFENDANTS-RESPONDENTS, AND ASSOCIATION OF NEW JERSEY COUNTY FACULTIES, INC., *ET AL.*, PLAINTIFFS-APPELLANTS, v. THE NEW JERSEY BOARD OF HIGHER EDUCATION, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued October 9, 1973—Decided March 5, 1974.

340

*Mr. William S. Greenberg* argued the cause for the appellants (*Messrs. Sterns & Greenberg,* attorneys; *Mr. Michael J. Herbert,* on the brief).

*Mr. Theodore A. Winard,* Assistant Attorney General, argued the cause for the respondents (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* of counsel; *Mr. Arthur Winkler,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

JACOBS, J.  On September 15, 1972 the defendant Board of Higher Education adopted a resolution which set forth general guidelines for the granting of tenure to faculty members in the State Colleges and for the periodic evaluation of tenured faculty members.  The plaintiff Association of New Jersey State College Faculties, Inc., along with others, brought a Law Division action attacking the resolution and in due course the action was transferred to the Appellate Division.  On October 20, 1972 the Board adopted a similar resolution with respect to County Colleges.  The Association of New Jersey County College Faculties, Inc., along with others, appealed therefrom to the Appellate Division.  *R.* 2:2–3(a).  The matters were consolidated in the Appellate Division and while awaiting argument there we certified under *R.* 2:12.

New Jersey's Department of Higher Education (*N. J. S. A.* 18A:3–1 *et seq.*) has for some time been concerned with the proportion of tenured and nontenured faculty at State Colleges.  This concern has been the subject of comprehensive study within our State and comparable concern has been the subject of comprehensive study elsewhere.  See, *e. g.,* Tenure

at the State Colleges of New Jersey (Department of Higher Education, Office of the Chancellor, June, 1972); *Faculty Tenure, A Report and Recommendations by the Commission on Academic Tenure in Higher Education* (The Jossey-Bass Series in Higher Education 1973). At various intervals the Department expressed to the State Colleges and to the Board of Higher Education (*N. J. S. A.* 18A:3-6) its view that tenure reforms were necessary and that unduly high proportions of tenured faculty disserved sound educational interests. In October, 1971 the Chairman of the Board of Higher Education addressed a letter to the Chairman of the Council of State Colleges suggesting the establishment of a joint committee to discuss the matter. The suggestion was not directly implemented but the Council proceeded on its own with the establishment of a committee headed by Dr. Clyde Davis of Glassboro State College. This committee prepared a report which was transmitted to the Board of Higher Education. Thereafter the Board requested the Chancellor (*N. J. S. A.* 18A:3-20) to prepare a staff study on the tenure situation at the State Colleges for the Board's consideration at its July, 1972 meeting. Such a study was prepared and its results were embodied in a June, 1972 report by the Chancellor, *supra.*

The report in its first section dealt with "Tenure and Institutional Flexibility." It noted that while there is a definite advantage to an institution in having "a stable group of faculty whose professional careers are secure," by tenure or otherwise, "an institution in which all faculty members are tenured would find itself in an intolerable situation." It would "quickly stagnate internally and lose most, if not all, of its ability to develop and change over time, consistent with its need to be responsive to the society in which it exists." It must retain "a degree of flexibility in the allocation of its faculty resources" so that it may start new programs, introduce young scholars, and meet urgent social policy by conduct such as active recruitment of "minority and female faculty members."

In its second section the Chancellor's report dealt with "What Proportion of the Faculty Should Be Tenured?" It recognized that it was not possible to establish with certainty the precise proportion of tenured faculty which would "'provide maximum flexibility while at the same time assuring a satisfactory base of faculty security and continuity.'"* It recognized further that in the ultimate the determination would involve delicate matters of policy and judgment, though empirical data would be helpful in determining an appropriate range. In this connection the practices at state colleges and universities throughout the country were reviewed. A 1969–70 study of state and land grant colleges indicated that 54.8% of their faculties were under tenure; a study of 31 major universities in 1961–62 indicated an average tenure rate of 57.6%; an earlier study indicated a tenure rate of 53%; and a very recent study indicated that most of the public four-year colleges had less than half of their faculties on tenure, a significant number had between 51% and 70% on tenure and only a small number had over 71% tenured.

The report expressed the view that "a tenured faculty of between 50% and 60% is probably normative" and that "while normative patterns cannot, of course, be assumed to reflect sound practice, the general consensus which has developed at many institutions, each operating independently of the others, is perhaps evidence that a faculty tenured at that level is desirable." It concluded that a tenure ratio of 60% would generally "fulfill the dual and often conflicting institutional needs of both flexibility and stability." This

---

*See A. H. Raskin, New York Times, January 16, 1974, *p.* 66: "The classic conception is that such flexibility is best insured by having roughly half the full-time faculty in tenured positions. The nationwide ratio now is just about at that level." *Cf. Lewis B. Mayhew, The Carnegie Commission on Higher Education, p.* 103 (Jossey-Bass 1973) : "Institutions should be careful not to allow the proportion of the faculties on tenure to exceed approximately 50 percent."

may be compared favorably with the following recommendation in the *Faculty Tenure* report (Jossey-Bass Series), *supra* at 50–51:

> The commission recommends that each institution develop policies relating to the proportion of tenured and nontenured faculty that will be compatible with the composition of its present staff, its resources and projected enrollment, and its future objectives. In the commission's nearly unanimous judgment, it will probably be dangerous for most institutions if tenured faculty constitute more than one half to two thirds of the total full-time faculty during the decade ahead. The institution's policy in this matter, which should be flexible enough to allow for necessary variation among subordinate units, should be used as a guide in recruitment, reappointment, and the award of tenure. Special attention should be given to the need to allow for significant expansion of the proportion of women and members of minority groups in all faculties, especially in the tenured ranks. In achieving its policy goals as to the proportion of its faculty on tenure, institutions will need to proceed gradually in order to avoid injustice to probationary faculty whose expectations of permanent appointments may have been based on earlier, more liberal practices.

In a section captioned "The Current Tenure Status in the State Colleges" the Chancellor's report dealt with tenure proportions as evidenced by data submitted by the State Colleges in the spring of 1972. The tenured faculty in the colleges was approximately 63% in 1971 and had climbed to 71% in January, 1972. It was estimated that the range of tenured faculty at the colleges in 1972 would probably be "between 58% at the campus with the lowest tenure ratio and 75% at the campus with the highest tenure ratio." The report noted that while this indicated a serious tenure problem on some campuses, other factors affecting the tenure ratio must also be considered including "the growth of tenured faculty during the past several years, the effect of decreasing enrollment growth in the years ahead, the distribution of tenured faculty by department, and the distribution of tenured faculty by rank." The number of newly tenured faculty appeared generally to exceed the number of older tenured faculty who were leaving the colleges and if this trend continues, the report said, it could produce a faculty "six

years from now which may be 77% tenured." The report pointed out that while the tenure problem was serious enough at college-wide levels, it was perhaps even more serious at departmental levels since 30% of all departments were over 80% tenured. And it referred specially to the proportion of tenured assistant professors and instructors which it described as unduly high and which it ascribed to the practice of granting tenure without requiring "positive evidence of scholarly achievement and excellence in teaching."

In addition to its proposal for the adoption of an appropriate tenure ratio, the report recommended various practice and policy changes designed generally towards the end that the granting of tenure be confined to those who have not only performed satisfactorily but who have also evidenced that they are likely to contribute to future development of the college. It recommended that each of the State Colleges establish an institutional master plan forecasting its personnel requirements. It suggested that the planning should be considered "an on-going process involving faculty, administration, students, and trustees, as appropriate, and should serve as a basic guide for personnel actions." And it noted that in presenting an individual recommendation for tenure there should be suitable indication that the recommendation is consistent with the master plan. In its discussion of "qualifications for tenure" the report suggested the establishment of criteria which would ordinarily include the possession of "an appropriate terminal degree or its equivalent." However, the report noted that the requirement of a terminal degree was a matter upon which "reasonable men may reasonably disagree." In its closing remarks the report listed the advantages and disadvantages of the policies it proposed and concluded that "on balance, the advantages far outweigh the disadvantages."

At its July, 1972 meeting the Board discussed the Chancellor's report but deferred action until its fall meeting. In the meantime, copies of the report had been sent to the presidents of the State Colleges with the request that they furnish

them to their faculty senates for discussion, comments and recommendations which would be transmitted to the Board. On September 15, 1972, the Board, expressing its belief that, while continuous appointment of a significant proportion of a college faculty is a desirable goal, too high a proportion of tenured faculty precludes necessary flexibility, and its further belief that the recommendations in the Chancellor's report "represent a sound approach to reform of the tenure process at the State Colleges," adopted a resolution embodying the following policies regarding tenure in the State Colleges of New Jersey:

1) Each college Board of Trustees shall prepare a ten-year plan for its institution indicating the steps it plans to take to achieve a future balance of faculty in which no more than a reasonable proportion are ultimately tenured. The purpose of limiting the proportion of tenured faculty on each campus is to retain flexibility to enable the institution to respond to changing educational needs in the future. The plan established by each board shall include the proportion of tenured faculty projected each year during the ten-year period. The college trustees shall report their plan to the Board of Higher Education and shall inform the Board each year of the progress being made in achieving their goals.

2) Each State College Board of Trustees shall establish internal policies which indicate either that it will impose specific restrictions or more intensive and rigorous review procedures for any reappointment conferring tenure which brings the proportion of individuals in a department (or other major academic sub-unit) or in the college as a whole above its present level. Reappointments conferring tenure which raise the tenure rate above that level shall be made only as an unusual action when judged by the college Board of Trustees as being in the best interests of the college.

3) A reappointment conferring tenure may be offered only to faculty members who possess an appropriate terminal degree or its equivalent, except under unusual circumstances when the granting of tenure to an individual not having these qualifications is judged by a college Board of Trustees as being in the best interests of the institution.

4) Tenure should be awarded only to individuals whose performance during their probationary period gives clear evidence of the ability and willingness to make a significant and continuing contribution to the growth and development of the institution.

5) Tenure should be awarded after presentation of positive evidence of excellence in teaching, scholarly achievement, contribution to

college and community, and fulfillment of professional responsibilities, and not solely because negative evidence to the contrary is not presented.

6) Each college Board of Trustees should establish a procedure which the college will employ to regularly evaluate the performance of tenured faculty members. Such evaluations should occur not less frequently than every five years. These evaluations, which should include student input, should comprehend such factors as continued teaching competence, professional preparation and attainments which are directly related to teaching or administrative assignments, contributions to campus life beyond formal, assigned instructional activity and significant research, scholarly or community activity.

On September 21, 1972 the Office of the Chancellor sent a memorandum to the presidents of all of the County Community Colleges. In it, attention was called to the material in the June, 1972 report and to the need for flexibility in Community Colleges, particularly "in view of their mission and changing curriculums." The memorandum noted that while the situation was not yet as critical in the Community Colleges as it had become in the State Colleges, there were indications that "serious problems may develop unless sound policies are initiated now." Copies of the resolution embodying the policies with respect to the State Colleges accompanied the memorandum with the suggestion that they be considered and discussed at a forthcoming "meeting of the Association of County College Presidents on September 28th." At its meeting on October 20, 1972 the Board, having received an endorsement from the Council of County Colleges, adopted a resolution concerning tenure policies in County Colleges. This resolution set forth policies regarding tenure in the Community Colleges which were in major respects similar to those announced with respect to State Colleges.

On November 29, 1972, after the plaintiffs had instituted legal proceedings challenging the Board's action, the resolutions were filed with the Secretary of State as emergency rules within *N. J. S. A.* 52:14B–4(c). They were published as such in the New Jersey Register on January 4, 1973. 5 *N. J. R.* 8(e) and 9(a). Thereafter the Board filed notice in the New

Jersey Register (5 *N. J. R.* 143(d), 144(a)) that the public and interested persons would be afforded an opportunity to comment and that the Board may refile the rules without further notice. The Board received no comments from members of the public or other interested parties and on July 20, 1973 it promulgated separate resolutions readopting as administrative rules its tenure policies in State and County Colleges. On July 27, 1973 the Board refiled its tenure policies as administrative rules with the Division of Administrative Procedure (5 *N. J. R.* 265(a) and (b)) and thereafter they were assigned citations in the New Jersey Administrative Code. *N. J. A. C.* 9:2–9.1 *et seq.* and 9:4–6.1 *et seq.*

The plaintiffs have grounded their attacks on the resolutions on three points set forth in their briefs. We shall deal with them in the order presented. Their first point asserts that the Board of Higher Education, in adopting the faculty tenure rules, violated the "procedural requirements of the New Jersey Administrative Procedure Act." *N. J. S. A.* 52:14B–4. See *Motyka et al. v. McCorkle et al.*, 58 *N. J.* 165, 179–181 (1971); *N. J. Builders, Owners and Managers Association v. Blair*, 60 *N. J.* 330, 341 (1972); *cf. Beckworth v. N. J. State Parole Bd.*, 62 *N. J.* 348 (1973). The resolutions were originally filed with the Secretary of State and were published in the New Jersey Register as "emergency rules" under *N. J. S. A.* 52:14B–4(c) which permits such filing and publication without prior notice and hearing when the agency finds "an imminent peril to the public health, safety, or welfare."

The Board of Higher Education notes that at the time the resolutions were originally adopted, the academic year had begun, review procedures for faculty members eligible for tenure appointments were occurring on the college campuses, and the date for notification of reappointment or nonreappointment was drawing near. The Board notes further that the proportion of tenured faculty at the State and County Colleges was already "approaching a level which seriously threatened the future quality, content, and direction of the educational program offered by the institutions individually

and the system of public higher education as a whole" and that it "believed that it was imperative that appropriate standards and criteria for conferring tenure be applied immediately at the institutions of higher education." Prior formal notice and opportunity for submission of statements and arguments would clearly have been the preferable course; but in the light of the foregoing assertions of belief by the Board we are not prepared to say, on the very limited record before us, that its original procedure was legally improper; in any event its subsequent action which included adequate formal notice and opportunity to submit statements and arguments was sufficient to satisfy *N. J. S. A.* 52:14B-4(a), and to render the procedural issue moot. See *Motyka, et al. v. McCorkle, et al., supra,* 58 *N. J.* at 179–181.

Furthermore, the plaintiffs are in no position to establish that they were in anywise prejudiced by the suggested procedural deficiency. Copies of the Chancellor's report had been duly sent to faculty senates for their reactions and recommendations. When thereafter pertinent meetings were held by the Board, it gave due notice that it would consider adopting tenure policies in furtherance of the report; the Board states that notice was widely sent to interested parties including "the Association of New Jersey State College Faculties, Inc., the New Jersey State Federation of Teachers, the New Jersey Education Association, and the State and County College Newspapers." At oral argument, counsel acknowledged that the plaintiffs were fully aware of the published notice that any written statements and arguments which they chose to submit would be duly received and considered by the Board of Higher Education. The plaintiffs chose not to submit any writings, apparently in the belief that such submission would be unfruitful. Be that as it may, the plaintiffs had in legal contemplation been afforded sufficient notice and hearing in substantial fulfillment of the terms of the Administrative Procedure Act. See *Motyka et al. v. McCorkle et al., supra,* 58 *N. J.* at 179–181.

██ We reject the plaintiffs' first point and come now to their second point under which they assert that "The Board of Higher Education transcended its rule-making authority by adopting Faculty Tenure Rules which illegally impair the tenure rights of the appellants." Though the Legislature was careful to vest substantial measures of autonomy in the individual colleges, it was equally careful to vest overall supervisory responsibilities in the Board of Higher Education. Thus *N. J. S. A.* 18A:3–13 declares that it shall be the duty of the Board of Higher Education "to advance long-range planning for the system of higher education as a whole in the state"; *N. J. S. A.* 18A:3–14(h) directs the Board to "establish general personnel policies for the public institutions of higher education"; *N. J. S. A.* 18A:3–15 provides that the Board may adopt rules for "implementing and carrying out" the law; and *N. J. S. A.* 18A:3–16 provides that in addition to the powers specifically provided by law the Board shall have all powers "requisite to the performance of its duties." In setting forth the powers and duties of the individual colleges, including the power and duty to appoint, promote, transfer and remove (*N. J. S. A.* 18A:64–6(g),(h), (i)), the Legislature made certain to avoid obscurities on the issue by specifying that the conduct of the State Colleges shall be in accordance with "the general policies and guidelines set by the board of higher education" (*N. J. S. A.* 18A:64–6) and that the management of the County Colleges shall be "in accordance with the rules and regulations of the board of higher education". *N. J. S. A.* 18A:64A–11; see also *N. J. S. A.* 18A:64A–7; *N. J. S. A.* 18A:64A–12.

The pointed breadth of the aforecited legislative delegation is comparable to other legislative delegations in the educational field such as those dealt with in *Jenkins, et al. v. Tp. of Morris School Dist. and Bd. of Ed.,* 58 *N. J.* 483 (1971) and in earlier decisions of this Court. See *Bd. of Ed. of Elizabeth v. City Coun. of Elizabeth,* 55 *N. J.* 501 (1970); *Bd. of Ed., E. Brunswick Tp. v. Tp. Council, E. Brunswick,* 48 *N. J.* 94 (1966); *Booker v. Board of Education, Plainfield,* 45

*N. J.* 161 (1965). It leaves us with little room for doubt that the Board has been legislatively vested with power to establish tenure guidelines which it considers educationally desirable so long as those guidelines are reasonable in nature and do not impair any specific statutory provision dealing with tenure. The plaintiffs contend that the guidelines impair their tenure rights under *N. J. S. A.* 18A:60–1 (see also *L.* 1973, *c.* 163) but we are satisfied that they do not.

*N. J. S. A.* 18A:60–1 does not set forth criteria which are to govern the granting of tenure; nor does the recent "Act concerning tenure for certain State and County college faculty members". *L.* 1973, *c.* 163 (*N. J. S. A.* 18A:60–6 *et seq.*). Nothing in the legislation directs that one whose classroom or professional performance is satisfactory must have his or her contract renewed over the three (*N. J. S. A.* 18A:60–1) or the five (*L.* 1973, *c.* 163) year period so as to enable the acquisition of tenure. Historically many considerations other than unsatisfactory classroom or professional performance have entered into discretionary determinations not to afford tenure and the determinations have not been interfered with judicially. Indeed our decisions to date have broadly upheld such discretionary right to deny tenure even without any accompanying statement of reasons. See *Zimmerman v. Board of Education of Newark,* 38 *N. J.* 65 (1962), *cert. denied,* 371 *U. S.* 956, 83 S. Ct. 508, 9 L. Ed. 2d 502 (1963) ; *cf. Donaldson v. Board of Education of City of North Wildwood,* 115 *N. J. Super.* 228 (*App. Div.* 1971), *certif. granted,* 59 *N. J.* 272 (1972) ; *Katz v. Board of Trustees of Gloucester County College,* 118 *N. J. Super.* 398 (*App. Div.* 1972).

While some of us would depart from the precedents so as to require a statement of reasons (*cf. Board of Regents v. Roth,* 408 *U. S.* 564, 92 S. Ct. 2701, 33 *L. Ed. 2d* 548 (1972) ; *Perry v. Sindermann,* 408 *U. S.* 593, 92 S. Ct. 2694, 33 *L. Ed. 2d* 570 (1972)), none of us would take the position that the reasons, to be sufficient, must be grounded entirely on unsatisfactory classroom or professional performance. To

the contrary we are convinced that well within the contemplation of *N. J. S. A.* 18A :60–1 and *L.* 1973, *c.* 163, the educational priorities and institutional needs may properly be considered, along with the pertinent individual factors, in deciding whether to grant tenure.

The plantiffs have directed their attack primarily on the first, second and sixth paragraphs of the Board's resolution. In the first paragraph the Board set forth its educational goal of a college faculty in which "no more than a reasonable proportion" is tenured; this to insure sufficient "flexibility to enable the institution to respond to changing educational needs in the future." In the second paragraph it directed more rigorous review of any prospective reappointment conferring tenure which may bring the proportion of tenured personnel above "its present level." Where the present level is high, such as in excess of 60%, the phraseology of the second paragraph presents no problem. However, where the present level is low, such as 30 or 40%, a problem is presented but it may safely be assumed that in such situation the Board did not at all contemplate freezing the present level for any length of time. The overall purpose, as evidenced throughout the entire resolution, is to avoid the granting of tenure to those not sufficiently qualified and to avoid the granting of tenure in such high proportion as to defeat the needed institutional flexibility. To the extent that any alterations in the language of the resolution consistent with that purpose may be required, particularly in the light of *L.* 1973, *c.* 163 which was enacted after the promulgation of the resolution, it may be assumed that they will be made expeditiously by the Board itself; in any event the attack by the plaintiffs before us is not grounded on any deficiencies in draftsmanship but is grounded on basic legal contentions which we are rejecting in this opinion.

In the sixth paragraph the Board set forth that procedures should be established for the regular evaluation of "the performance of tenured faculty members." The plaintiffs contend that *N. J. S. A.* 18A :60–1 makes no provision

for such periodic evaluation and they are fearful that it may afford a basis for dismissal beyond that contemplated by the provisions of *N. J. S. A.* 18A:60–1 and *N. J. S. A.* 18A:60–2. There would not appear to be any substantial basis for the fear since the resolution is not directed towards dismissal or the grounds therefor. As the Board's counsel asserts, the sixth paragraph represents "an affirmative effort by the Board to foster the professional development of its tenured faculty to improve, polish and expand their skills." *L.* 1973, *c.* 163 specifically provides that under guidelines established by the State Board of Higher Education, it shall be the responsibility of each college to establish formal procedure for the career development of the professional staff, including "a systematic and regular evaluation for the purpose of identifying any deficiencies, extending assistance for their correction and improving instruction." We need not pursue the subject matter here for we are not now called upon to determine the grounds of dismissal either under *N. J. S. A.* 18A:60–1, 2 or *L.* 1973, *c.* 163. There will be time enough for that if and when any dismissal charges are formally preferred for deficiencies appearing from the periodic evaluations.

In their third and final point the plaintiffs contend that "the unilateral adoption of the Tenure Rules violated the New Jersey Employer-Employee Relations Act." That Act provides in section 7 (*N. J. S. A.* 34:13A–5.3) that a majority representative of public employees in an appropriate unit may act for all employees in the unit and that the majority representative and designated representatives of the public employer shall meet at reasonable times and "negotiate in good faith" with respect to grievances and "terms and conditions of employment." It also provides that proposed new rules or modifications of existing rules governing "working conditions" shall be negotiated with the majority representative before they are established. The Act is unclear in failing to define "working conditions" or "terms and conditions of employment" as used in section 7 and in

failing to specify what subjects are mandatorily negotiable and what subjects are exclusively within management's prerogatives. But it makes clear that its statutory terms may not be viewed so expansively as to negate the Board of Higher Education's overall supervisory responsibilities as set forth in New Jersey's Education Law (Title 18A). See, *e. g.*, section 10 (*N. J. S. A.* 34:13A–8.1) which explicitly provides that no provision in the Act shall "annul or modify any statute or statutes of this State."

In *Dunellen Board of Education v. Dunellen Education Association,* 64 *N. J.* 17 (1973), we were recently called upon to decide whether the local board of education's determination to consolidate the chairmanships of the Social Studies Department and the English Department was a proper subject of mandatory negotiation or arbitration under the Employer-Employee Relations Act. We held that it was not, pointing out that the determination to consolidate was predominantly a matter of educational policy within the exclusive management prerogatives of the local board. Similarly in *Burlington County College Faculty Association v. Board of Trustees, Burlington County College,* 64 *N. J.* 10 (1973), we held that the fixing of the college calendar involved a major educational determination within the exclusive responsibility of those entrusted with administering the college. See also *Board of Education of City of Englewood v. Englewood Teachers Association,* 64 *N. J.* 1 (1973); *Rutgers Council of American Assoc. of University Professors v. N. J. Bd. of Higher Education, et al.,* 126 *N. J. Super.* 53 (*App. Div.* 1973); *cf.* Race, "Collective Bargaining in Higher Education," II *Texas Southern L. Rev.* 281 (1973); "Collective Negotiations in Higher Education: A Symposium," 1971 *Wis. L. Rev.* 1.

In the aforecited cases we noted that it was "our clear judicial responsibility to give continuing effect to the provisions in our Education Law (Title 18A) without, however, frustrating the goals or terms of the Employer-Employee Relations Act (*N. J. S. A.* 34:13A–1 *et seq.*)." *Dunellen,*

*supra,* 64 *N. J.* at 24–25. As pointed out earlier in this opinion, the tenure resolutions of the Board of Higher Education were adopted well within the statutory powers and duties set forth in *N. J. S. A.* 18A:3–13; *N. J. S. A.* 18A:3–14(h); *N. J. S. A.* 18A:3–15; *N. J. S. A.* 18A:3–16; *N. J. S. A.* 18A:64–6(g),(h),(i). They represent major educational policy pronouncements entrusted by the Legislature to the Board's educational expertise and objective judgment. While the guidelines towards institutional excellence and greater administrative care in the granting of tenure undoubtedly entail individual consequences, they embody only matters not mandatorily negotiable under the principles expressed in *Dunellen, supra,* 64 *N. J.* 17, *Burlington, supra,* 64 *N. J.* 10, and *Englewood, supra,* 64 *N. J.* 1. *Cf. Faculty Tenure* report (Jossey-Bass Series) *supra* at 90: "The commission recommends that collective bargaining in colleges and universities not extend to academic freedom and tenure and related faculty personnel matters, and that grievances involving issues of freedom and tenure be referred to academic procedures outside the collective bargaining process."

The Legislature has not indicated any disagreement with the *Dunellen* principles (64 *N. J.* 17) or their application to date. Nor has it expressed itself on tenure in relation to negotiation except in section 4 of Chapter 163 of the Laws of 1973. That section provides in effect that, notwithstanding the prescribed five-year probationary period, the board of trustees of the college may "as an exceptional action," and by a two-thirds majority of all of its members, grant tenure to "an individual faculty member" after employment for two consecutive academic years. Section 4 then concludes with the following: "The provisions of this section shall not be negotiable as a term and condition of employment under the 'New Jersey Employer-Employee Relations Act'." It is noteworthy that in this single statutory mention of tenure in relation to negotiation, mandatory negotiation is specifically excluded. It appears evident to us, particularly in the light

of the continuing effect of section 10 of the Employer-Employee Relations Act (*N. J. S. A.* 34:13A–8.1), that the legislative silence elsewhere may not fairly or sensibly be construed as impairing the Board of Higher Education's exclusive statutory power under the Education Law to promulgate tenure guidelines which are reasonable in nature and which are not in conflict with any specific statutory provision dealing with tenure.

■ Although our present decision supports the Board of Higher Education's position that its tenure guidelines were not mandatorily negotiable, it is not to be taken as support for any notion that such guidelines or alterations therein should be promulgated without full and timely prior consultation with accredited faculty representatives and others interested. On the contrary, we take this occasion to reiterate the views expressed in the following concluding paragraph in *Dunellen* which may be taken to have general application:

"The holding that the consolidation was predominantly a matter of educational policy not mandatorily negotiable does not indicate that the Board would not have been well advised to have voluntarily discussed it in timely fashion with the representatives of the teachers. Peaceful relations between the school administration and its teachers is an ever present goal and though the teachers may not be permitted to take over the educational policies entrusted by the statutes to the Board they, as trained professionals, may have much to contribute towards the Board's adoption of sound and suitable educational policies. Before the passage of New Jersey's Employer-Employee Relations Act (*N. J. S. A.* 34:13A–1 *et seq.*) it was recognized that public employees had the right to be heard through their representatives on their proposals and grievances. The Act significantly broadened that right and, with the goal of peaceful labor relations in mind, created fields of mandatory negotiation. It would seem evident that, when dealing in fields with which the teachers are significantly concerned though outside the fields of mandatory negotiation, the end of peaceful labor relations will generally be furthered by some measure of timely voluntary discussion between the school administration and the representatives of its teachers even though the ultimate decisions are to be made by the Board in the exercise of its exclusive educational prerogatives." 64 *N. J.* at 31–32.

Affirmed.

*For affirmance* — Justices JACOBS, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—5.

*For reversal*—None.