THE NEW JERSEY STATE BOARD OF HIGHER EDUCATION AND T. EDWARD HOLLANDER, CHANCELLOR OF THE NEW JERSEY DEPARTMENT OF HIGHER EDUCATION, PLAINTIFFS-RESPONDENTS, v. THE BOARD OF DIRECTORS OF SHELTON COLLEGE, GLENN ROGERS AND CARL MCINTIRE, DEFENDANTS-APPELLANTS.

Argued March 8, 1982—Decided August 9, 1982.

472

*William Bentley Ball*, a member of the Pennsylvania bar, argued the cause for appellants (*Bashaw & Burro*, attorneys; *William Bentley Ball, Philip J. Murren, Kathleen A. O'Malley* and *C. Clark Hodgson, Jr.*, members of the Pennsylvania bar, of counsel; *Keith J. Bashaw* and *C. Peter Burro*, on the brief).

*Robert A. Fagella*, Deputy Attorney General, argued the cause for respondents (*Irwin I. Kimmelman*, Attorney General of New Jersey, attorney; *Erminie L. Conley*, Assistant Attorney General, of counsel).

*Michael F. Spicer* submitted a brief on behalf of *amicus curiae* The Association of Independent Colleges and Universities of New Jersey (*Jamieson, McCardell, Moore, Peskin & Spicer*, attorneys; *Michael F. Spicer* and *Laura C. Ford*, on the brief).

*Garrett M. Heher* submitted a brief on behalf of *amicus curiae* Council of County Colleges (*Smith, Stratton, Wise & Heher*, attorneys; *Garrett M. Heher* and *Thomas E. Kopil*, on the brief).

The opinion of the Court was delivered by

O'HERN, J.

Two provisions of New Jersey's education law, *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6, prohibit the conferring of baccalaureate degrees by any institution that has not secured a license from the State Board of Higher Education. We hold that application of these statutes to a sectarian college whose religious doctrine precludes state licensure does not violate the First Amendment.

## I.

Shelton College is an institution of higher education operated by the Bible Presbyterian Church as part of the church's religious mission. Members of this fundamentalist Christian church believe that every aspect of their lives, including education, must be governed by their faith. Shelton's teachers and students believe that their presence at the college is for the purpose of preparing themselves and others to undertake missions that

their Lord calls upon them to perform. Religion pervades Shelton College. Every academic subject is taught from a Christian fundamentalist perspective and students must conform their behavior to religiously derived codes of conduct. Shelton College is a school of approximately 30 students, but those who attend it cherish its mission.

The procedural pilgrimage of Shelton College to this point of decision began after the school opened operations in New Jersey in the 1950's under a temporary license issued by the State. In 1965, the State Board of Education passed a resolution proposing to terminate Shelton's power to confer baccalaureate degrees because the college had failed to comply with certain minimum requirements. Shelton appealed the Board's action, challenging the constitutionality of *N.J.S.A.* 18A:68–3 and *N.J. S.A.* 18A:68–6, the statutes that regulate the award of baccalaureate degrees. *Shelton College v. State Bd. of Ed.*, 48 *N.J.* 501 (1967) (*Shelton I*). Specifically, Shelton asserted that (1) any state regulation of baccalaureate degrees abridges the right of free speech guaranteed by the New Jersey and Federal Constitutions; (2) the licensing statute effected an overbroad delegation of legislative power to an administrative agency, in violation of the New Jersey Constitution; and (3) the legislation deprived Shelton of equal protection of law because it contained limited exemptions for institutions that had the authority to confer academic degrees prior to 1887. *Id.*

The Court upheld the statutes against Shelton's constitutional attacks and affirmed the action of the State Board of Education. Central to the Court's decision was its discussion of the bachelor's degree and the State's interest in preserving the degree's integrity. Chief Justice Weintraub carefully traced the history of New Jersey legislation relating to the granting of baccalaureate degrees, and concluded that

... it is the degree, evidential as it is of academic attainment, which especially is an appropriate object of regulation.... "The power to confer academic degrees is to be regarded as distinct and separate from the privilege of being incorporated as an educational institution. The privilege of granting degrees is

very intimately related to the public welfare, and is unquestionably subject to regulation by the State." [*Shelton I, supra,* 48 *N.J.* at 511, quoting Elliot, *The Colleges and the Courts* (1936) p. 200].

Thus, *Shelton I* held that the State has a substantial interest in regulating the bachelor's degree and that it may constitutionally prohibit the granting of such degrees by unlicensed institutions.

In 1971, after *Shelton I* and the conclusion of related litigation, *In Re Shelton College,* 109 *N.J.Super.* 488 (App.Div.1970), the State Board of Higher Education revoked Shelton's temporary license to award degrees in New Jersey. Shelton College moved its operations to Florida where it obtained a license to confer bachelor's degrees in that state. It has continued to operate there up to the present time and, as late as May 1981, applied to Florida officials for renewal of its license.

In February of 1979, Shelton College submitted a new application to the New Jersey State Board of Higher Education, seeking authorization to award baccalaureate degrees in Biblical Literature, Christian Education, Elementary Education, Secondary Education, English, History, Business Management, Music Education and Natural Science. Before it secured such authorization, however, Shelton began to offer credit-bearing courses in New Jersey that it represented would lead to a bachelor's degree. On November 15, 1979, the State Board of Higher Education brought suit in the Superior Court, Chancery Division, alleging that Shelton's New Jersey operations violated *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 which prohibit the conferring of degrees or the furnishing of instruction for the purpose of conferring degrees, except by licensed institutions. The State Board sought an injunction restraining Shelton from engaging in any form of educational instruction, offering any credits, or granting any degrees until it obtained a license authorizing it to do so. The Chancery Court granted a preliminary injunction to that effect.

On November 19, 1979, Shelton College and various students and faculty members instituted an action under 42 *U.S.C.*

§ 1983 in the United States District Court for the District of New Jersey. The federal plaintiffs alleged that application of the New Jersey licensing statutes to Shelton College violated rights guaranteed them by the First, Ninth and Fourteenth Amendments to the United States Constitution. They sought both declaratory and injunctive relief.

The District Court issued a preliminary injunction, enjoining the State from taking any action to prevent Shelton College from engaging in religious teaching or educational activities, or from publicizing or advertising these activities.[1] Although the court granted partial injunctive relief to the federal plaintiffs, it abstained from deciding whether the New Jersey licensing statutes apply to religious institutions, such as Shelton College. The District Court stayed the federal action to permit the state courts to resolve this issue.

In February 1980, the State Board appealed the District Court's order to the United States Court of Appeals for the Third Circuit, and the federal plaintiffs cross-appealed. While the federal appeal was pending, the state court action proceeded to trial in June 1980. At this trial Shelton College presented its federal constitutional claims. The Superior Court upheld the constitutionality of the licensing statutes as applied to Shelton College and on December 10, 1980 entered a permanent injunction which, among other things, restrained the college from awarding course credits or degrees in New Jersey without a license from the State Board of Higher Education. Shelton filed notice of appeal to the Appellate Division.

On April 14, 1981, a divided Third Circuit upheld the Federal District Court's order granting injunctive relief, and approved the court's decision to stay further federal proceedings pending completion of the state court action. On May 18, 1981, the District Court entered a revised preliminary injunction that

---

[1]The Superior Court subsequently modified its preliminary order to conform with the federal court's preliminary injunction.

prohibited the State Board of Higher Education from enforcing or implementing the Superior Court's order of December 10, 1980, "until such time as the Supreme Court of New Jersey definitively construes the New Jersey statutes and regulations which are the subject of this action." *New Jersey-Philadelphia Presbytery of the Bible Presbyterian Church v. New Jersey State Board of Higher Education*, 514 *F.Supp.* 506, 515 (1981). We directly certified the matter on petition of the parties. 88 *N.J.* 500 (1981).[2]

## II.

Before addressing the constitutional issues raised by this appeal, we first consider whether *N.J.S.A.* 18A:68–3 and *N.J. S.A.* 18A:68–6 apply to religious institutions such as Shelton College. Read literally, these statutes clearly encompass Shelton College. They require that *all* institutions—regardless of religious character or affiliation—obtain a license before offering degree programs or conferring degrees. Nonetheless, defendants urge us to adopt a narrowing construction of these statutes—excluding Shelton from their ambit—so as to avoid the constitutional issues that otherwise would emerge. Defendants suggest that this result could be achieved by employing a standard of statutory construction announced by the United States Supreme Court in *NLRB v. Catholic Bishop of Chicago*, 440 *U.S.* 490, 99 *S.Ct.* 1313, 59 *L.Ed.2d* 533 (1979). In that case the court declared that any interpretation of a statute that "would give rise to serious constitutional questions" must be rejected unless the construction is compelled by "the affirmative

---

[2]We do not pass upon the complex problems of federalism presented by the movements of the parties between state and federal courts. Those issues divided the appeals panel in this case, *N. J. Phila. Presbytery v. N. J. State Bd.*, 654 *F.2d* 868 (3rd Cir. 1981). *Cf. Middlesex Ethics Committee v. Garden State Bar Association et al.,* —— *U.S.* ——, 102 *S.Ct.* 2515, 73 *L.Ed.2d* 116 (1982) (federal courts should abstain from interfering with ongoing disciplinary proceedings where proceedings provided attorney under investigation with adequate opportunity to present constitutional claims).

intention of the Congress clearly expressed." *Id.* at 501, 99 *S.Ct.* at 1319, 59 *L.Ed.2d* at 541. Applying this standard, the Court held that the National Labor Relations Act does not extend to lay teachers employed by parochial schools, even though the act's general terms include such employees. The Court concluded that application of the National Labor Relations Act to church-operated schools would implicate the Religion Clauses of the First Amendment but that there existed no affirmative expression of legislative intent sufficient to compel the constitutionally troublesome interpretation of the act.

Four dissenting justices assailed the Court's opinion, stating that the majority had "seemingly invented . . . a canon of statutory construction . . . for the purposes of deciding this case." The dissent would have adhered to the principle of statutory construction set out in *Machinists v. Street*, 367 *U.S.* 740, 81 *S.Ct.* 1784, 6 *L.Ed.2d* 1141 (1961):

"When the validity of an act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is *fairly possible* by which the question may be avoided." *Crowell v. Benson*, 285 *U.S.* 22, 62 [52 *S.Ct.* 285, 296] 76 *L.Ed.* 598, 619. [*Id.* at 749, 750, 81 *S.Ct.* at 1789, 1790, 6 *L.Ed.2d* at 1150 (emphasis added) ].

The dissent concluded that

. . . [W]hile the resolution of the constitutional question is not without difficulty, it is irresponsible to avoid it by a cavalier exercise in statutory interpretation which succeeds only in defying congressional intent. A statute is not "a nose of wax to be changed from that which the plain language imports. . . ." *Yu Cong Eng v. Trinidad*, 271 U.S. [500] at 518, 46 *S.Ct.* [619] at 623, 70 L.Ed. 1059. [*NLRB v. Catholic Bishop of Chicago, supra*, 440 *U.S.* at 518, 99 *S.Ct.* at 1328, 59 *L.Ed.2d* at 552].

■ Under New Jersey law, a challenged statute will be construed to avoid constitutional defects if the statute is "reasonably susceptible" of such construction. *State v. Profaci*, 56 *N.J.* 346, 350 (1970); *Woodhouse v. Woodhouse*, 17 *N.J.* 409, 416 (1955). Thus, our standard for construing statutes of uncertain constitutionality closely resembles the principle of construction advocated by the dissent in *Catholic Bishop*. But even if we were to accept the broader standard elaborated by the *Catholic*

*Bishop* majority, we would still be constrained to find that the New Jersey licensing statutes apply to Shelton College.

The Legislature's intent with regard to these statutes is clear and unambiguous. *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 speak in absolute terms. They prohibit the granting of baccalaureate degrees by *any* institution that has not secured a license from the State Board of Higher Education. The sole exception to this regulatory scheme appears in *N.J.S.A.* 18A:68–6. There the Legislature expressly exempted institutions that were operating on April 1, 1887 by virtue of special legislative grant. See *L.* 1912, *c.* 315; *Shelton I, supra,* 48 *N.J.* at 507. No such exemption was created for sectarian colleges. Nor does the legislative history even hint at an intent to exclude religious schools from the scope of these statutes. To the contrary, the history of the higher education licensing provisions demonstrates a legislative intent to regulate the conferring of baccalaureate degrees by religious as well as secular institutions. See *Id.* at 509–16.

The first higher education "approval" statute, entitled "An Act to prescribe the terms and conditions under which degrees may be conferred by any school or institution of learning within this State," was adopted in 1912. *L.* 1912, *c.* 315. This legislation did not, however, mark the State's first involvement with the bachelor's degree. Prior to 1912 the Legislature passed several special acts of incorporation that authorized a number of secular and sectarian institutions to confer baccalaureate degrees. Passage of these acts evidenced the Legislature's belief that even a sectarian college's power to confer degrees could be conditioned on state authorization. There is no reason to infer that the Legislature's view in this regard changed before passage of *L.* 1912, *c.* 315. We must assume therefore that when the Legislature adopted *L.* 1912, *c.* 315, it was aware of the existence of religiously oriented colleges. We must also assume that the Legislature understood that such institutions would come within the literal terms of the statute. Yet, although the act included an express exemption clause, it contained no exemption for religious colleges.

Related provisions of New Jersey education law supply further evidence of legislative intent. Thus *N.J.S.A.* 18A:68–2 provides that seminaries and schools of theology may grant bachelor's degrees "*subject to the provisions of this chapter.*" (Emphasis added.) This statute appears in Chapter 68 of the education laws, together with the licensing statutes.

The current statutory scheme also confirms that the Legislature affirmatively intended to regulate the conferring of degrees by religious institutions. In 1966, the Legislature created a Department of Higher Education, the office of Chancellor of Higher Education, and a Board of Higher Education. *L.* 1966, *c.* 302, §§ 1, 2 (see now *N.J.S.A.* 18A:3–1, –6, –20). The Board has been given broad authority over the system of higher education in this State. *N.J.S.A.* 18A:3–13. See, *Association of New Jersey State College Faculties v. Dungan*, 64 *N.J.* 338 (1974). Pursuant to *N.J.S.A.* 18A:3–13, it is the duty of the Board "to advance long-range planning for the system of higher education *as a whole* in the State." (Emphasis added.) Religious oriented colleges and universities comprise a significant proportion of the institutions of higher learning in this State. If such institutions were permitted to reject even minimal state regulation, the legislative intent manifested by these education laws would be defeated.

Finally, the practice relative to *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 has been to apply the licensing requirements to all degree-granting institutions, regardless of religious affiliation. The Legislature has acquiesced in this long-standing practice. This is strong evidence that the current application of these statutes conforms to legislative intent. *See, Division of Taxation v. Body-Rite*, 89 *N.J.* 540 (1982).

In summary, we see no basis to infer that the Legislature intended to exempt Shelton College and like institutions from the requirements of *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6. We construe statutes in accord with the Legislature's intent, even if to do so will give rise to substantial constitutional

questions. We hold that *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 apply to Shelton College.

## III.

We turn now to defendants' claim that application of *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 to Shelton College unconstitutionally infringes upon the free exercise of their religion. Decisions in cases such as this regrettably involve courts in an examination of religious practices and inevitably call for "a delicate balancing of important but conflicting interests." *Wisconsin v. Yoder,* 406 *U.S.* 205, 237, 92 *S.Ct.* 1526, 1544, 32 *L.Ed.*2d 15, 38 (1972) (White, J., concurring). In this case we must decide whether the State's interest in regulating academic degrees constitutionally justifies the burden that such regulation may impose on defendants' freedom to hold and practice their religious beliefs.

We begin by determining whether application of the statutory licensing requirements to Shelton College interferes with the free exercise of defendants' religion. Defendants profess as a principle of their faith that the Bible commands the separation of church and state. Recently, the Bible Presbyterian Church interpreted this religious precept as prohibiting Shelton College from submitting to licensure by the New Jersey Board of Higher Education. We note, however, that defendants did apply for renewal of Shelton's Florida license subsequent to their espousal of this scriptural interpretation.

Although the First Amendment wisely prohibits courts from questioning the validity of religious beliefs, *United States v. Ballard,* 322 *U.S.* 78, 64 *S.Ct.* 882, 88 *L.Ed.* 1148 (1944), it does not preclude judicial inquiry into the sincerity of those who claim exemption on religious grounds from a law of general application. *Id.* Despite defendants' apparently inconsistent adherence to the asserted religious tenet, however, we decline to inquire into their sincerity on the record before us. Rather, we shall assume, for purposes of this appeal, that licensure of

Shelton College would conflict with a principle of defendants' religion.

Accepting this assumption, the Board of Higher Education nonetheless maintains that application of *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 to Shelton College does not abridge defendants' Free Exercise rights. The Board points out that even if enforcement of those statutes against Shelton causes the college to close, no direct interference with religious practice occurs because defendants' religion does not require attendance at Shelton College.

■■■■ This argument undervalues the constitutional right to exercise one's religion freely. The First Amendment guarantee of religious freedom protects against more than direct state proscription of religious practices. See, *e.g.*, *Cantwell v. Connecticut*, 310 *U.S.* 296, 60 *S.Ct.* 900, 84 *L.Ed.* 1213 (1940). Any state action that unduly burdens the free exercise of religion violates the First Amendment. *Thomas v. Review Bd. Indiana Emp. Sec. Div.*, 450 *U.S.* 707, 101 *S.Ct.* 1425, 67 *L.Ed.2d* 624 (1981); *Wisconsin v. Yoder, supra,* 406 *U.S.* at 220, 92 *S.Ct.* at 1535, 32 *L.Ed.2d* at 28; *Sherbert v. Verner,* 374 *U.S.* 398, 404, 83 *S.Ct.* 1790, 1794, 10 *L.Ed.2d* 965, 970 (1963). Even facially neutral legislation may give rise to a burden on religion if, as applied to a particular religious sect, it forces individuals to choose between abandoning their religious beliefs or sacrificing an important government benefit.

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden on religion exists. [*Thomas v. Review Bd. Indiana Emp. Sec. Div., supra,* 450 *U.S.* at 717–18, 101 *S.Ct.* at 1432, 67 *L.Ed.2d* at 634].

In *Thomas* a Jehovah's Witness refused on religious grounds to accept work building weapons. Indiana officials rejected Thomas' application for unemployment compensation, ruling that he had failed without good cause to accept employment and was therefore ineligible to receive benefits. Thus, Indiana's

unemployment compensation law effectively forced Thomas to choose between his faith and financial benefits that he may well have needed to subsist. The Supreme Court held that imposition of this choice violated the Free Exercise clause of the First Amendment.

In an analogous manner, *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 require defendants to choose between a tenet of their religion and the privilege of conferring baccalaureate degrees. Clearly the dilemma that New Jersey's education law poses for defendants is not as cruel or coercive as was the choice thrust upon Thomas by the Indiana Unemployment Compensation Act. Nevertheless, we must conclude that the New Jersey licensing statutes, as applied to Shelton College, impose some burden on the exercise of religion.

This conclusion does not, however, terminate the inquiry. Not all burdens on religion are unconstitutional. *United States v. Lee,* —— *U.S.* ——, 102 *S.Ct.* 1051, 71 *L.Ed.2d* 127 (1982); *Prince v. Massachusetts,* 321 *U.S.* 158, 64 *S.Ct.* 438, 88 *L.Ed.* 645 (1944); *Smith v. Ricci,* 89 *N.J.* 514 (1982). Legislation that impedes the exercise of religion may be constitutional if there exists no less restrictive means of achieving some overriding state interest.[3] Thus, in *United States v. Lee, supra,* the Court held that although the Amish believe it sinful not to provide for their own elderly and needy and therefore are religiously opposed to the national social security system, they must nevertheless withhold, report and pay social security taxes on their employees. The Court said:

---

[3]A recent Federal Court of Appeals decision, *Bob Jones Univ. v. U. S.,* 639 *F.2d* 147, 153 (4th Cir. 1980), *cert. granted* 454 *U.S.* 892, 102 *S.Ct.* 386, 70 *L.Ed.2d* 205, more fully explicated this standard.

Assuming that the revocation of [tax exempt] status does impinge upon the university's practice to some extent the question remains one of balancing—giving due consideration to the weight of the interests asserted by the government and the extent and nature of the burden on the religious practice and the religion as a whole.

The conclusion that there is a conflict between the Amish faith and the obligations imposed by the social security system is only the beginning, however, and not the end of the inquiry. Not all burdens on religion are unconstitutional. The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest. [*United States v. Lee, supra,* —— *U.S.* at ——, 102 *S.Ct.* at 1055, 71 *L.Ed.2d* at 132 (citations omitted)].

The legislation at issue here advances the State's interest in ensuring educational standards and maintaining the integrity of the baccalaureate degree. Chief Justice Weintraub amply described the depth and importance of this interest from medieval times to the present in *Shelton I, supra*, 48 *N.J.* at 510–15. We need not reconstruct that discussion here. That Court's views may be summarized:

Whatever the reason for the modest governmental activity in this area, it was not for doubt as to the power of the States to act. In *Trustees of Dartmouth College v. Woodward*, 4 *Wheat.* 518, 634, 4 *L.Ed.* 629, 658 (1819), in which the charter of incorporation was held to be a contract the State could not undo, Chief Justice Marshall said, in axiomatic style:

"That education is an object of national concern, and a proper object of legislation, all admit." [48 *N.J.* at 510–11].[4]

Shelton's education expert testified that the bachelor's degree has been severely devalued by recent trends in education and that therefore the State currently has no significant interest in regulating the award of such degrees. Other educators have earnestly urged the contrary. In their *amicus* brief to this Court, the Association of Independent Colleges and Universities

---

[4]The Court recalled that the Supreme Court of Vermont refused to imply in a general charter the power to confer degrees, saying in *Townshend v. Gray*, 62 *Vt.* 373, 377, 8 *L.R.A.* 112, 115 (1890):

\* \* \* To hold that the legislature, by a general law, intended that any three men in any town in the state, however illiterate or irresponsible, might organize and flood the state with doctors of medicine, doctors of law, doctors of divinity, masters of arts, civil engineers, and all the other various titles that everywhere in the civilized world have signified high attainments and special equipment for professional work, is to liken it to the witty French minister who threatened to create so many dukes that it would be no honor to be one, and a burning disgrace not to be one.

of New Jersey [5] maintained that "there is a general expectation that institutions permitted to award degrees in this State will at least meet basic standards of educational integrity." *Amicus* stressed the importance of maintaining the value and integrity of academic degrees, and expressed the fear that, if such degrees are permitted to erode in value, "if there no longer can be a presumption of minimum standards—then students, educational institutions and the public will be harmed."

In addition, the legislation supports the State's purpose of protecting students, as potential consumers of higher education, from substandard education. It allows them to assume by virtue of a school's ability to grant degrees that it meets certain minimum standards.

That maintenance of minimum educational standards in all schools constitutes a substantial state interest is now beyond question. See, *e.g., Wisconsin v. Yoder, supra; Lemon v. Kurtzman,* 403 *U.S.* 602, 91 *S.Ct.* 2105, 29 *L.Ed.*2d 745 (1971); *Pierce v. Society of Sisters,* 268 *U.S.* 510, 45 *S.Ct.* 571, 69 *L.Ed.* 1070 (1925). Nothing in this record persuades us to the contrary. The Legislature has attached great importance to the fulfillment of these goals. We have no doubt of that legislative appraisal and conclude that the New Jersey licensing statutes are supported by a strong state interest in maintaining minimum academic standards and preserving the basic integrity of the baccalaureate degree.

Having reached this conclusion, we must now decide whether granting defendants a religious exemption from the licensing statutes would significantly hinder attainment of the state interest. If so, the statutes present the least restrictive means of fulfilling an overriding governmental interest and, as such, do not abridge defendants' rights of religious freedom. *U.S. v. Lee, supra,* —— *U.S.* at ——, 102 *S.Ct.* at 1056, 71 *L.Ed.*2d at 133.

[5] The Association of Independent Colleges and Universities of New Jersey is a membership organization composed of sixteen private nonprofit institutions of higher education. Ten of its member institutions have religious affiliations.

In New Jersey, the conferring of a baccalaureate degree connotes that certain minimum standards have been met by the issuing institution, and that the degree recipient has attained at least a basic level of academic proficiency. To this extent the value of academic degrees from New Jersey institutions traces directly to state regulation. Thus, by claiming a complete exemption from all state regulation defendants in effect ask that they be given a benefit without having to accept the correlative burden. In this sense, if the First Amendment requires that Shelton be permitted to confer degrees without a license, it must also require that unemployment compensation be disbursed to individuals who for religious reasons refuse to accept any employment whatsoever. *Sherbert* expressly warned that the First Amendment compels no such result. *Id.,* 374 *U.S.* at 409–10, 83 *S.Ct.* at 1796–97, 10 *L.Ed.2d* at 974.

■ *Sherbert, Thomas* and *Yoder* all hold that religious exemptions from neutral legislation must be provided where uniform enforcement of the legislation will unduly impinge upon the exercise of religion. But, as the Court in *U. S. v. Lee, supra,* recognized, the First Amendment does not require the provision of religious exemptions where accommodation would significantly interfere with the attainment of an overriding state interest. Such a requirement, the Court observed, would "radically restrict the operating latitude of the Legislature." *Id.* at ——, 102 *S.Ct.* at 1056, 71 *L.Ed.2d* at 134 (quoting *Braunfeld v. Brown,* 366 *U.S.* 599, 606, 81 *S.Ct.* 1144, 1147, 6 *L.Ed.2d* 563, 568 (1961)). Commentators have observed that it is when the religious exercise does "not materially affect the working of the secular program" that the free exercise claim is recognized. Freund, "Public Aid to Parochial Schools," 82 *Harv.L.Rev.* 1680 (1969). See also Clark, "Guidelines for the Free Exercise Clause," 83 *Harv.L.Rev.* 327 (1969). Here, accommodation of defendants' religious beliefs would entail a complete exemption from state regulation. As noted above, such accommodation would cut to the heart of the legislation and severely impede the achievement of important state goals. Furthermore, if an ex-

emption were created here, Shelton College would receive an advantage at the expense of those educational institutions that have submitted to state regulation. Such a development would undermine the integrity of the baccalaureate degree, erode respect for the state higher education scheme, and encourage others to seek exemptions. Thus, the uniform application of these licensing requirements is essential to the achievement of the State's interests. *See Braunfield v. Brown, supra* (state interest in uniform day of rest constitutionally justifies refusal to create religious exemptions to Sunday closing law). *See also U. S. v. Lee, supra,* —— *U.S.* at ——, 102 *S.Ct.* at 1057, 71 *L.Ed.2d* at 135–36 (Stevens, J., concurring).

In sum, although defendants' freedom of religion may suffer some indirect burden from this legislation, the constitutional balance nonetheless favors the state interest in uniform application of these higher education laws. As the U. S. Supreme Court noted,

> When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity. [*U. S. v. Lee, supra,* —— *U.S.* at ——, 102 *S.Ct.* at 1057, 71 *L.Ed.2d* at 134–35].

We conclude that *N.J.S.A.* 18A:68–3 and *N.J.S.A.* 18A:68–6 as applied to Shelton College do not abridge rights guaranteed by the Free Exercise Clause of the First Amendment.

## IV.

The Establishment Clause requires that a law reflect a secular legislative purpose, have a primary effect that neither advances nor inhibits religion, and avoid excessive entanglement with religion. *Committee for Public Education and Religious Liberty v. Regan,* 444 *U.S.* 646, 100 *S.Ct.* 840, 63 *L.Ed.2d* 94 (1980); *Committee for Public Education v. Nyquist,* 413 *U.S.* 756, 93 *S.Ct.* 2955, 37 *L.Ed.2d* 948 (1973); *Marsa v. Wernik,* 86 *N.J.* 232 (1981); *Resnick v. E. Brunswick Tp. Bd. of Ed.,* 77 *N.J.* 88 (1978). The secular purpose of the State's program for

higher education is unassailable. Defendants assert, however, that this regulatory scheme creates an excessive state entanglement with religion.

The United States Supreme Court has never questioned a state's interest in insuring, through licensure or accreditation, minimal academic standards in church-operated institutions.[6] *See, e.g., Pierce v. Society of Sisters, supra.* As stated in *Lemon v. Kurtzman, supra* :

> We ... have surveillance over sectarian schools but only to the extent of making sure that minimum educational standards are met, *viz*, competent teachers, accreditation of the school for diplomas, the number of hours of work and credits allowed, and so on.... Any surveillance to date has been minor and has related only to the *consistently unchallenged matters of accreditation of the sectarian school in the State's school system.* [403 *U.S.* at 631, 91 *S.Ct.* at 2120, 29 *L.Ed.*2d at 766 (Douglas, J., concurring) (emphasis supplied)].

The Establishment Clause permits minor, unobtrusive state supervision of religiously oriented schools. *Roemer v. Maryland Public Works Bd.*, 426 *U.S.* 736, 96 *S.Ct.* 2337, 49 *L.Ed.* 2d 179 (1976). Only excessive entanglement is proscribed. None of the education statutes or regulations here in question mandates "active involvement of the sovereign in religious activity." *Walz v. Tax Commissioner*, 397 *U.S.* 664, 668, 90 *S.Ct.* 1409, 1411, 25 *L.Ed.*2d 697, 701 (1970). None authorizes state regulation of the *content* of an educational program. Nor does

---

[6]Some state courts have invalidated comprehensive state licensing or approval powers over private religious schools where, as one court said, the minimum standard scheme was "so pervasive and all-encompassing that total compliance with each and every standard by a non-public school would effectively eradicate the distinction between public and nonpublic education." *State v. Whisner*, 47 *Ohio St.*2d 181, 351 *N.E.*2d 750 (1976). *See also, Kentucky State Board for Elementary and Secondary Education v. Rudasill*, 589 *S.W.*2d 877 (Ky.1979), *cert. denied*, 446 *U.S.* 938, 100 *S.Ct.* 2158, 64 *L.Ed.* 2d 792 (1980) (court based its decision on section 5 of the Kentucky Constitution, which states that "[n]o man [shall] be compelled to send his child to any school to which he may be conscientiously opposed...."); *State v. LaBarge*, 134 *Vt.* 276, 357 *A.2d* 121 (1976) (truancy). *But see Bob Jones University v. United States, supra*, and *Brown v. Dade Christian Schools*, 556 *F.2d* 310 (5th Cir. 1977), *cert. den.*, 434 *U.S.* 1063, 98 *S.Ct.* 1235, 55 *L.Ed.*2d 763, where religious belief in racial discrimination conflicts with governmental policy.

the regulatory scheme on its face require "comprehensive, discriminating and continuing state surveillance."[7] *Lemon v. Kurtzman, supra,* 403 *U.S.* at 619, 91 *S.Ct.* at 2114, 29 *L.Ed.2d* at 759. Although the regulations in this area, *N.J.A.C.* 9:1–1 to –2.14, appear to be burdensome, especially as applied to a college of approximately 30 students, they explicitly call for flexibility in their administration so as to accommodate various institutions with diverse educational goals.[8] *N.J.A.C.,* Title 9, Foreword. Because Shelton College declined even to complete the licensing

---

[7]In order to determine the nature of an institution, the State Board requires a statement of educational purpose. *N.J.A.C.* 9:1–1.2. The institution is then required to show that its various elements (faculty work, educational program, student life, finances, physical plant, organization and administration) are organized in a way supportive of this purpose. *N.J.A.C.* 9:1–1.2(b)(2). The institution must develop a long-range plan for implementing its goals, as well as periodically review its purpose and plans. *N.J.A.C.* 9:1–1.2(b)(3), (4); *N.J.A.C.* 9:1–1.3(a)(1). It is also required to conduct its affairs in a financially prudent manner, for its own protection and the protection of its students, creditors and other citizens. *N.J.A.C.* 9:1–1.4. The maintenance of legitimate financial records and insurance protection are intended to "assure the continuity of the institution." See *N.J.A.C.* 9:1–1.4(b). The regulations also recognize the importance of an adequate library. *N.J.A.C.* 9:1–1.8. There are suggested standards for admission to the institution. For example, the regulations propose that *normally* a high school diploma should be required. *N.J.A.C.* 9:1–1.9(b)(1). Adequate and safe physical facilities are also required. *N.J.A.C.* 9:1–1.10. In any areas where standards are proposed, however, no rigid mandates are maintained. Paragraph 5 of the Foreword to Title 9 of the New Jersey Administrative Code expresses this policy:

> The standards specify desirable and acceptable practices which further implement the good intentions of the law but are not required in a specific form so that institutional flexibility may be maintained. . . .

[8]The licensing procedures also engender a high degree of flexibility. Pursuant to *N.J.A.C.* 9:1–2.4 the Licensure and Approval Advisory Board is composed of seven representatives from various state and county colleges and universities, three representatives of the Association of Independent Colleges and Universities in New Jersey (AICUNJ), three persons representative of colleges not members of AICUNJ and one representative of the Department of Higher Education. The Board makes recommendations to the Chancellor regarding policies for licensure and specific petitions for licensure. *N.J.A.C.* 9:1–2.7. Participation in the licensing process by this diverse group representing both public and private institutions, seeks to ensure practicality in the administration of the program.

process, the allegation of excessive entanglement rests on speculation about the manner in which these statutes and regulations might be applied. Although one could imagine an unconstitutional application of this regulatory scheme, we are confident that the Board of Higher Education will pursue the least restrictive means to achieve the State's overriding concerns. Of course, should the Board exercise its discretion in a manner that unnecessarily intrudes into Shelton's religious affairs, the college would then be free to challenge the constitutionality of such action. At this juncture, however, we need not invalidate these statutes merely because they may be amenable to an unconstitutional application.

> ... It has not been the Court's practice, in considering facial challenges to statutes of this kind, to strike them down in anticipation that particular applications may result in unconstitutional [action]. [*Roemer v. Maryland Public Works Bd., supra,* 426 *U.S.* at 761, 96 *S.Ct.* at 2351, 49 *L.Ed.*2d at 196].

See *Village of Hoffman Estates v. Flipside Hoffman Estates Inc.,* —— *U.S.* ——, 102 *S.Ct.* 1186, 71 *L.Ed.*2d 362 (1982); *I/M/O Application of Maria Martin,* 90 *N.J.* 295 (1982).

### V.

In sum, we find that the State's program for licensing institutions of higher education is applicable to sectarian institutions and that facially it does not unduly interfere with the free exercise of religion nor create an excessive state entanglement with religion. At the same time, we recognize the good faith with which the students of Shelton College have pursued their educational and religious goals. To accommodate the free exercise interests of the individual students without unduly interfering with the state regulatory program, and in consideration of the difficulty involved in transferring to a different college at the end of three years, we modify the judgment below to allow the awarding of earned credits and degrees to all eligible students through the end of the 1982–83 academic year and to the class of 1984 through the end of the 1983–84 academic year. No other credits or degrees shall be awarded without licensure.

As modified, the judgment of the Chancery Division is affirmed.

*For affirmance as modified*—Chief Justice WILENTZ, and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*For reversal*—None.