IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 03-0995
════════════
 
HEB Ministries, Inc., 
Southern Bible Institute, and Hispanic Bible Institute 
, Petitioners,
 
v.
 
Texas Higher Education 
Coordinating Board and Commissioner Raymund Paredes , 
Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Third District of 
Texas
════════════════════════════════════════════════════
 
 
Argued January 5, 
2005
 
 
Chief Justice 
Jefferson, joined by Justice 
Green, concurring in part and dissenting in part.
 
The Board 
imposed a civil penalty against Tyndale for illegally 
issuing thirty-four degrees. Tyndale chose not to 
appeal that administrative penalty or the Board’s findings. Instead, HEB 
Ministries and two unrelated entities—Southern Bible Institute and Hispanic 
Bible Institute—launched a facial constitutional attack on portions of the Education Code. Specifically, HEB 
Ministries and its co-plaintiffs sought a declaration that sections 61.302(1) 
and 61.304 of the Education Code violated rights guaranteed by the Due Process, 
Free Speech, Establishment, and Free Exercise clauses of both the 
United States and Texas constitutions. Both 
the trial court and the court of appeals concluded that the statute regulating 
the issuance of degrees did not violate HEB Ministries’ constitutional rights. 
Today, however, a majority of the Court—for differing reasons—concludes 
otherwise. Because the statute does not unconstitutionally impinge on HEB 
Ministries’ freedom of speech or rights guaranteed by the Establishment Clause 
and the Free Exercise Clause, I respectfully dissent. I agree with the Court 
that section 61.313's restriction on the use of the name “seminary” by schools 
offering only religious programs of study violates the Free Exercise Clause, and 
I concur in that portion of the Court’s judgment.[1]
I
Establishment 
Clause
 
            
I agree with Justice 
Wainwright that this case 
is more appropriately analyzed under the Free Exercise Clause than the 
Establishment Clause. The Establishment Clause forbids any “law respecting an 
establishment of religion.” U.S. 
Const. amend. I. In State v. Corpus Christi 
People's Baptist Church, Inc., 683 S.W.2d 692, 695 (Tex. 1984), we held that 
an establishment clause challenge to a statute permitting state licensing and 
regulation of child-care facilities, as applied to church-operated facilities, 
was “misplaced.” We observed:
 
The 
Establishment Clause cases address the issue of whether some form of 
government aid, either direct or indirect, to a religious institution 
violates the Establishment Clause. 
 
            
Unlike the traditional Establishment Clause cases, this case involves government 
regulation of a child-care institution which is part of the church 
ministry. This distinction is important for two reasons. First, to accept [the 
church's] argument and invalidate the licensing and regulatory scheme because of 
"excessive entanglements" would create a dilemma in applying the three-pronged 
Establishment Clause test; the second prong would be at odds with the third. 
Requiring nonreligious childcare facilities to comply with the state licensing 
and regulatory scheme while exempting religious facilities would result in 
unequal state treatment of the two classes of institutions. This unequal 
treatment could, arguably, be impermissible under the second-prong of the 
Establishment Clause test because the primary effect would be to advance 
religion.
 
            
Second, state licensing and regulation is a type of entanglement that differs 
from the entanglement discussed in the traditional Establishment Clause cases. 
In those cases, the State must examine and determine what programs are religious 
and what programs are secular to ensure that government aid reaches only the 
nonreligious ones. In our case, the state regulatory scheme prohibits inquiry 
into the religious content of the homes' curriculum. The purpose of these 
regulations is to assure that all child-care facilities, secular and nonsecular, meet certain minimum standards in areas such as 
financial solvency, staff-child ratio, nutrition and medical care.
 
 
People’s Baptist Church, 683 S.W.2d at 695 (citations 
omitted). We concluded that the licensing requirement did not offend the 
Establishment Clause and noted that “[a] more appropriate and direct means of 
questioning the constitutionality of this government regulation is through . . . 
the Free Exercise Clause.” Id. at 
695. 
            
Such is the case here. As in People’s Baptist, requiring nonreligious 
higher-education institutes to comply with the accreditation scheme while 
exempting religious institutions would result in unequal treatment of the two, 
an impermissible advancement of religion under the second prong of the 
Lemon test. Id.; cf. Cutter v. Wilkinson, 544 U.S. 709, 722 
(2005)(noting that “an accommodation [for religious 
observance] must be measured so that it does not override other significant 
interests”); Jimmy Swaggart Ministries v. Bd. of 
Equalization, 493 U.S. 378, 396-97 (1990) (noting the irony that exempting 
religious activities from tax, as plaintiffs requested, would require the state 
to engage in the arguably impermissible task of determining which expenditures 
were religious and which were secular). Moreover, this case involves state 
regulation, not aid. The regulatory oversight at issue here is designed to 
ensure that all educational institutions—religious and secular alike—comport 
with minimum educational standards for issuing degrees. Subchapter G governs a 
secular matter: the creation of a system that recognizes certain types of 
post-secondary educational achievement. Accreditation signals not the approval 
of the school’s message, but a certification that the institution meets a 
variety of educational standards, and any institution—religious or otherwise—may 
apply for authorization to issue degrees. Accordingly, as in People’s 
Baptist, a “more appropriate and direct means of challenging the 
constitutionality” of this regulation is through the Free Exercise Clause. People’s Baptist, 683 S.W.2d at 695.
            
Even if the Establishment Clause were implicated, however, the statutory scheme 
here passes muster.
 
Under 
Lemon, a government practice is constitutional if: (1) it has a secular 
purpose; (2) its principal or primary effect neither advances nor inhibits 
religion; and (3) it does not excessively entangle the government with 
religion.
 
 
Williams v. Lara, 52 S.W.3d 171, 189 (Tex. 2001). The 
plurality concedes that the accrediting statute has a secular purpose and that 
its primary effect neither advances nor inhibits 
religion. Instead, the plurality concludes that it is “beyond serious dispute 
that the statute clearly and excessively entangles the government in matters of 
religious instruction.” ___ S.W.3d at ___. 
            
In Agostini v. Felton, the Supreme Court 
noted that Lemon’s “excessive entanglement” prong was more properly analyzed as 
a subset of the second prong: whether the regulation’s primary effect advanced 
or inhibited religion. Agostini, 521 
U.S. 203, 232-33 (1997). The 
Court also noted that “[n]ot all entanglements, of 
course, have the effect of advancing or inhibiting religion,” and that because 
“[i]nteraction between 
church and state is inevitable, . . .[e]ntanglement must be ‘excessive’ before it runs afoul of the 
Establishment Clause.” Id. at 
233.
            
At least one state court has explored the contours of this inevitable 
interaction between church and state in a context similar to ours. As the 
plurality notes (and respectfully disagrees with), the Tennessee Supreme Court 
upheld broad state regulation of a religious school that issued only religious 
degrees. State v. Clarksville School of Theology, 
636 S.W.2d 706, 711 (Tenn. 1982). The court’s 
reasoning is instructive:
 
            
[The Tennessee 
statute] places neither a direct nor indirect burden upon the free exercise of 
religion by the defendants nor threatens an entanglement between the affairs of 
church and state. . . . [T]he Act does not regulate the beliefs, practices or 
teachings of any institution; it merely sets forth minimum standards which must 
be met in order for an institution to be authorized to issue degrees. Moreover, 
the evidence shows that the granting of degrees is a purely secular activity. It 
is only this activity that brings the School under the regulation of the Act. 

. . .
            
The School can choose to not comply with the Act and yet may continue to train 
ministers as it chooses; such non-compliance with the Act will simply prohibit 
the School from granting degrees.
 
 
Id. at 
709; see also N.J. State Bd. of Higher Educ. v. Bd. 
of Dirs. of Shelton College, 448 A.2d 988, 997-998 (N.J. 1982) (rejecting 
Establishment Clause challenge to a statute regulating post-secondary education, 
as there was no excessive entanglement between church and state).
            
Similarly, the regulations here, while comprehensive, are entirely voluntary and 
do not purport to interfere with the parochial mission of any school. See, e.g., Roemer v. Md. Public Works Bd., 426 
U.S. 736, 764 (1976) (plurality 
op.) (determining that contacts between state and colleges for purposes 
of administering aid program “are not likely to be any more entangling than the 
inspections and audits incident to the normal process of the colleges' 
accreditations by the State”). The plurality contends that “[t]here is no 
special provision for religious instruction, and not only is the Board given no 
discretion to treat such education differently than secular education, it has given no indication that it would be 
willing to do so if it could.” ___ S.W.3d at ___. But 
the statute, as well as the Coordinating Board’s accompanying regulations, 
expressly permit religious institutions to be certified without meeting the 
standard qualifications for accreditation. Section 61.308(e) provides:
 
If, after 
a good-faith effort, an institution cannot achieve accreditation within the 
period of time prescribed by the board, the institution may appeal for extension 
of eligibility for certification because of having been denied accreditation 
due to policies of the institution based on religious beliefs or other good 
and sufficient cause as defined by the board. The board shall consider the 
application of any accreditation standard that prohibited accreditation of the 
institution on the basis of religious policies practiced by the institution as a 
prima facie justification for extending the eligibility for certification if all 
other standards of the board are satisfied.
 
 
Tex. Educ. Code § 61.308(e) (emphasis 
added).[2] During the relevant time, the pertinent 
regulations provided:
 
If the 
board determines that an institution has been unable to achieve accreditation by 
a recognized agency on the basis of religious policies practiced by the 
institution, the board will consider the institution eligible to apply for a 
certificate of authority, provided that all other standards are met at the level 
of accreditation and that such religious institutions shall be eligible to 
grant degrees of a religious nature only.
 
 
19 Tex. Admin. Code § 
5.215(d)(4) (2003).[3] That Tyndale 
has “steadfastly refused,” 114 S.W.3d at 630, to participate in any of these 
alternate processes does not make them any less available, and we should not 
invalidate the statutes “merely because they may be amenable to an 
unconstitutional application.” Shelton College, 448 A.2d at 490; see 
also Roemer, 426 U.S. at 761 (noting that “[i]t 
has not been the Court's practice, in considering facial challenges to statutes 
of this kind, to strike them down in anticipation that particular applications 
may result in unconstitutional [actions]”). 
            
The plurality concludes that the State’s regulations on degree-granting violate 
the Establishment Clause because allowing some religious institutions (those 
that meet accreditation requirements) to grant degrees while forbidding others 
to do so “clearly effectuate[s] a state preference for one model of religious 
education over others, a preference that the Establishment Clause does not 
permit.” ___ S.W.3d at ___. The plurality asserts that 
“[i]t is hard to imagine a more active involvement in 
religious training than by determining whether it meets the comprehensive 
standards set by the Coordinating Board, and equally hard to imagine a more 
direct state sponsorship of religious education than by indicating in every 
institution’s name and on every academic award whether the State approves the 
programs of study.” Id. at ___ (emphasis added). If this is 
indeed the case, the logical implication is that the State cannot accredit 
any religious colleges or universities that offer degrees in any 
religious discipline,[4] as such accreditation would also appear 
to run afoul of the Establishment Clause as an impermissible preference under 
the plurality’s analysis. Nor, it seems to me, could the State regulate or 
license religious institutions operating in other spheres, e.g., 
church-affiliated broadcasting stations. Further, the plurality’s analysis would 
seem to apply to invalidate state regulation of marriage or adoption, if that 
regulation was inconsistent with the tenets of a particular religion. The state 
can regulate in these areas, as I believe it can regulate the issuance of 
degrees, because allowing religious institutions to participate in secular 
regulatory schemes simply does not violate the Establishment Clause. 
            
The Supreme Court rejected a similar argument in Bob Jones University v. 
United States, a case in which Bob Jones University contended, among other 
arguments, that denying it a tax exemption violated the Establishment Clause by 
preferring religions whose tenets did not require racial discrimination over 
those that believed racial intermixing was forbidden. Bob Jones, 461 
U.S. 574, 604 n.30 
(1983). The Court held that:
 
[i]t is well settled that neither a state nor the Federal 
Government may pass laws which prefer one religion over another, but it is 
equally true that a regulation does not violate the Establishment Clause merely 
because it happens to coincide or harmonize with the tenets of some or all 
religions. The IRS policy at issue here is founded on a neutral, secular basis, 
and does not violate the Establishment Clause. In addition, . 
. . the uniform application of the rule to all religiously operated 
schools avoids the necessity for a potentially entangling inquiry into whether a 
racially restrictive practice is the result of a sincere religious belief.
 
 
Id. 
at 604-05 (citations and internal quotations omitted). I agree with 
that analysis and would hold that subchapter G, similarly, is founded on a 
neutral, secular basis and does not violate the Establishment Clause. 
II
Free Exercise 
Clause
 
            
I also agree with Justice Wainwright 
that subchapter G does not violate the Free Exercise clause. Indeed, the 
plurality’s extended analysis is inappropriate because HEB Ministries does not 
maintain that the conduct in which it is prohibited from engaging (the issuance 
of degrees and similar documents) is religiously motivated. As the Supreme Court 
explained in United States v. Lee, the “preliminary inquiry in 
determining the existence of a constitutionally required exemption” from a 
neutral law of general application under the Free Exercise Clause is whether 
compliance with the law “violates [the challengers’] religious beliefs” and thus 
“interferes with their free exercise rights.” United States v. Lee, 455 
U.S. 252, 256-257 (1982). The cases 
cited by the plurality affirm this rule. In Employment Division v. Smith, 
the law at issue forbade the religiously motivated use of peyote;[5] in Church of the Lukumi Babalu Aye, Inc. v. City of 
Hialeah,[6] the law prohibited the ritual sacrifice 
of animals demanded by the Santeria religion; even in Shelton, the New 
Jersey Supreme Court case, the plaintiff college alleged that state 
accreditation was inconsistent with the Bible’s command that it reject state 
licensure.[7]
            
By contrast here, HEB Ministries is not claiming that accreditation violates any 
religious principles. HEB Ministries does not contend that its religious tenets 
require its graduates to hold documents the general public would likely confuse 
with degrees granted by accredited colleges. HEB Ministries does not allege that 
there is any religious significance to “degree,” “bachelor’s,” or similar terms. Moreover, the State has not 
prohibited Tyndale from describing accurately its 
graduates’ achievements. To give but one example, subchapter G would not 
prohibit a religious institution from issuing a document certifying that “John 
Doe has completed an advanced course of study in X and is qualified to minister 
in Y church.” 
            
Even assuming that a prohibition on the issuance of degrees (or similarly worded 
documents) violated HEB Ministries’ religious beliefs, its Free Exercise claims 
would fail because the Coordinating Board would maintain the right to ensure 
educational standards. As Justice Scalia, writing for 
the Court, noted in Employment Division v. Smith, the Supreme Court has 
“never held that an individual's religious beliefs excuse him from compliance 
with an otherwise valid law prohibiting conduct that the State is free to 
regulate.” Smith, 494 U.S. 872, 878-79 
(1990).[8] The only exceptions to this rule “have 
involved not the Free Exercise Clause alone, but the Free Exercise Clause in 
conjunction with other constitutional protections,” such as the protection of 
freedom of speech. Id. at 
881. 
            
Thus, in order to arrive at the conclusion that subchapter G violates the Free 
Exercise Clause, the plurality engages in a strained reading of the record and 
the case law—characterizing the statute as restricting “the communication of 
religious beliefs” such that the State must have a compelling interest and must 
tailor its accreditation scheme narrowly. The plurality would implement this 
heightened scrutiny when “the law affects communication.” ___ S.W.3d at 
___ (emphasis added). But the Smith Court used the word “regulate” 
in discussing this line of cases,[9] and a careful examination of precedent 
reveals a much higher level of state involvement necessary to implicate the 
freedom of speech analysis. The examples of “hybrid” freedom of speech and Free 
Exercise decisions cited in Smith involved a discretionary licensing 
system for religious solicitation, requiring the State to determine whether a 
given cause was religious[10] and a flat tax on solicitation as 
applied to dissemination of religious ideas.[11]         

            
The regulations that were struck down under a “hybrid” analysis directly limited 
religious communication. In contrast, Tyndale and 
similar institutions are free under subchapter G to say and teach whatever they 
wish without government involvement—they are merely barred from issuing a degree 
misrepresenting the nature of the education they choose to provide. Despite 
assertions to the contrary,[12] subchapter G cannot fairly be construed 
as so pervasively, or even substantially, affecting communications as to trigger 
strict scrutiny, and, thus, even if HEB Ministries’ conduct were religiously 
motivated, subchapter G would not violate the Free Exercise Clause.
III
Free 
Speech
 
            
I disagree with Justice 
Wainwright’s contention, however, that the State may only regulate 
“degrees” and not associated terminology like the terms “associate,” 
“bachelor’s,” “master’s,” and “doctorate.”[13] Justice Wainwright would hold that the 
State may regulate a single word—degree—and that all other regulations violate 
the United States Constitution. This distinction overlooks the significance of 
the terminology used to connote educational achievement. Words like 
“bachelor’s,” “master’s”, and “doctorate” have acquired meanings that permit 
them to stand on their own, even absent the noun—“degree”—they are generally 
understood to modify. When these absolute adjectives[14] are used as marks of educational 
attainment, they represent the conferment of “degrees” and permit, as here, an 
unaccredited institution’s graduates to overstate their credentials. 
            
Additionally, Justice Wainwright’s 
concurrence goes beyond the protections HEB Ministries itself sought. HEB 
Ministries has conceded that diplomas in secular disciplines are subject to 
state regulation. It asserts only that diplomas awarded in religious disciplines 
are exempt. But if the statute violated the First Amendment’s free speech 
guarantee, any post-secondary institution—whether religiously affiliated or 
not—would be permitted to award “the equivalent” of doctorates, master’s, 
bachelor’s, and associate degrees, in any academic discipline. Imagine a “doctor 
of engineering,” who received his degree from an unaccredited school, hired by 
the State to inspect and repair bridges. Cf. Westbrook v. Penley, No. 04-0838, ___ S.W.3d ___, ___ (Tex. 2007) 
(holding that tort liability would impinge upon matters of church governance, in 
violation of the First Amendment, but noting that neither the respondent’s nor 
the public’s health or safety were at issue). 
            
Such a holding would strip the Board of authority to regulate “diploma mills,” 
the very evil the Legislature sought to control through the regulatory scheme 
set forth in the Education Code. See Tex. Educ. Code § 61.301. As the Legislature 
noted in enacting the statute:
 
It is the 
policy and purpose of the State of Texas to prevent deception of the public 
resulting from the conferring and use of fraudulent or substandard college and 
university degrees; it is also the purpose of this subchapter to regulate the 
use of academic terminology in naming or otherwise designating educational 
institutions, the advertising, solicitation or representation by educational 
institutions or their agents, and the maintenance and preservation of essential 
academic records. Because degrees and equivalent indicators of educational 
attainment are used by employers in judging the training of prospective 
employees, by public and private professional groups in determining 
qualifications for admission to and continuance of practice, and by the general 
public in assessing the competence of persons engaged in a wide range of 
activities necessary to the general welfare, regulation by law of the evidences 
of college and university educational attainment is in the public interest. To 
the same end the protection of legitimate institutions and of those holding 
degrees from them is also in the public interest.
 
Id. 
            
Justice Wainwright correctly recognizes that the speech 
at issue is commercial speech. As such, it occupies one of the lowest rungs on 
the First Amendment hierarchy, enjoying only a “‘limited measure of protection, 
commensurate with its subordinate position in the scale of First Amendment 
values,’ and is subject to ‘modes of regulation that might be impermissible in 
the realm of noncommercial expression.’” Bd. of Trustees v. Fox, 492 
U.S. 469, 477 (1989) (quoting 
Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 456 (1978)). Commercial 
speech does “no more than propose a commercial transaction” and may be freely 
regulated. Pittsburgh Press Co. v. Pittsburgh Comm’n on Human 
Relations, 413 U.S. 376, 385 (1973). 
            
In Central Hudson Gas & Electric Corp. v. Public Service Commission of 
New York, 447 U.S. 557, 566 (1980), the Supreme 
Court outlined its method of analyzing the lawfulness of restrictions on 
commercial speech:
 
In 
commercial speech cases, then, a four-part analysis has developed. At the 
outset, we must determine whether the expression is protected by the First 
Amendment. For commercial speech to come within that provision, it at least must 
concern lawful activity and not be misleading. Next, we ask whether the asserted 
governmental interest is substantial. If both inquiries yield positive answers, 
we must determine whether the regulation directly advances the governmental 
interest asserted, and whether it is not more extensive than is necessary to 
serve that interest.
 
 
            
In this case, Justice Wainwright 
cites but misapplies the Central 
Hudson test by excising its first prong. Because HEB 
Ministries’ speech is misleading commercial speech, it is not protected by the 
First Amendment. Thompson v. W. States Med. Ctr., 535 
U.S. 357, 367 (2002). As the 
Central Hudson 
Court noted, “there can be no constitutional 
objection to the suppression of commercial messages that do not accurately 
inform the public about lawful activity. The government may ban forms of 
communication more likely to deceive the public than to inform it . . . .” 
Central Hudson, 447 U.S. at 563 (emphasis added). Thus, 
“the government may freely regulate commercial speech that . . . is misleading,” 
Florida Bar v. Went For It, 515 U.S. 618, 623-24 (1995) (citations 
omitted), and the remaining Central Hudson factors apply only if the 
speech is not misleading. 
            
The record in this case leaves little doubt that HEB Ministries’ speech was 
misleading. The program from Tyndale’s June 1998 
Commencement Exercises lists various headings, such as “Doctor of Philosophy,” 
“Doctor of Theology,” “Doctor of Ministries,” “Master of Theology,” “Master of 
Arts,” “Bachelor Level Diploma of Theological Studies,” and “Associate of 
Biblical Studies.” Beneath each heading are the names of students who had 
completed those courses of study. The course catalog nowhere states that Tyndale does not offer degrees, and the catalog in fact 
conveys the opposite impression. It features department heads and faculty 
members who identify themselves as “doctors,” even though they have only 
diplomas from Tyndale, an institution without a 
certificate of authority issued by the Coordinating Board. Faculty members use 
the familiar abbreviations for degrees, such as “Ph.D.” and “Th.D.” even though they do not have actual degrees. In its 
advertising materials, Tyndale boasted that its 
“[g]raduates are . . . receiving professional pay 
increases with Tyndale diplomas, a sign of recognition 
and acknowledgement.” Moreover, the Board found that Tyndale awarded degrees, and HEB Ministries did not appeal 
that determination. 
            
Because misleading commercial speech may be freely regulated, HEB Ministries’ 
free speech claim must fail, and the Court need not reach the remaining 
Central Hudson factors. But even 
if the speech were not misleading, the statute easily satisfies the other 
Central Hudson requirements. As the Court recognizes (and HEB Ministries 
does not dispute), the State’s interest here is substantial. “Diploma mills” are 
an ongoing problem, made more prevalent by the advent of the Internet. See, 
e.g., Roger J. Cramer, Managing Director, U.S. General Accounting Office, 
Testimony before the U.S. Senate Committee on Governmental Affairs, Diploma 
Mills: Federal Employees Have Obtained Degrees from Diploma Mills and Other 
Unaccredited Schools, Some at Government Expense 7 (May 11, 2004), http://gao.gov/new.items/d04771t.pdf 
(May 11, 2004) (all Internet materials as visited August 29, 2007, and available 
in clerk of court’s case file)(noting that some senior-level federal employees, 
including management-level employees responsible for emergency operations at the 
National Nuclear Security Administration, had obtained degrees from diploma 
mills and other unaccredited schools); Pa. Sues College That Gave Cat an MBA, 
Dec. 7, 2004, http://www.foxnews.com/story/0,2933,140727,00.html 
(describing alleged Texas diploma mill that, in exchange for $299, awarded an 
MBA to a cat in Pennsylvania); Press Release, Texas Office of Attorney General, 
Attorney General Abbott Gets Judgment Against Brothers Who Operated Fraudulent 
Dallas Diploma Mill (Mar. 17, 2005), http://www.oag.state.tx.us/oagnews/release.php?id=841 
(describing judgment obtained against Trinity Southern University, which awarded 
bachelor’s master’s, and doctorate degrees based only on students’ testimony 
about life experiences). 
            
Because the State’s interest is substantial, Central Hudson’s other factors 
come into play: whether the regulation directly advances the State’s interest, 
and whether the regulatory technique is “in proportion to that interest.” Cent. Hudson, 447 U.S. at 564. As 
the Supreme Court has noted, however, the Constitution does not require the 
narrowest possible restriction:
 
What our 
decisions require is a “‘fit’ between the legislature's ends and the means 
chosen to accomplish those ends,” — a fit that is not necessarily perfect, but 
reasonable; that represents not necessarily the single best disposition but one 
whose scope is “in proportion to the interest served”; that employs not 
necessarily the least restrictive means but, as we have put it in the other 
contexts discussed above, a means narrowly tailored to achieve the desired 
objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best 
be employed.
 
 
Bd of 
Trs. v. Fox, 492 U.S. 469, 480 
(1989) (citations omitted). 
            
Here, the statute represents a reasonable means of accomplishing the 
Legislature’s ends. Justice 
Wainwright concludes that a disclaimer would “better inform the public” 
about Tyndale students’ educational accomplishments 
than would compliance with the statute; thus, he concludes that “the State has 
not carried its burden of showing that its regulation of this commercial speech 
directly advances its interest because the regulation is more extensive than 
necessary to serve the Legislature’s legitimate purposes.” ___ 
S.W.3d at ___. But merely because the State has not chosen the narrowest 
means to achieve its objective does not mean the statute is unconstitutional. As 
Fox recognized, the State need only demonstrate a reasonable fit between 
the Legislature’s ends and the means chosen to accomplish those ends. 
Fox, 492 U.S. at 480. The Education Code 
satisfies those requirements. The statutory requirements here do not diminish 
commercial speech but merely ensure its accuracy. See Friedman v. Rogers, 
440 U.S. 1, 16 (1979) (noting that 
“[r]ather than stifling commercial speech, [the 
statute at issue] ensures that information regarding optometrical services will be communicated more fully and 
accurately to consumers than it had been in the past”). While a disclaimer may 
also fulfill that goal, the absence of such a requirement does not render the 
statute unconstitutional.
            
Justice Wainwright warns that the statute coopts “virtually every term that could reasonably provide a 
useful description of educational achievement at a postsecondary educational 
institution.” ___ S.W.3d at ___. I disagree. The 
statute prohibits use of only those terms that “signif[y], purport to, or [are] generally taken to signify 
satisfactory completion of the requirements of . . . a program of study leading 
to an associate, bachelor’s, master’s, or doctor’s degree or its equivalent.” 
Tex. Educ. Code § 61.302(1). Thus, as the 
State correctly contends, Tyndale may issue diplomas 
or certificates without running afoul of the statute, as long as it does not 
claim that they are equivalent to associate, bachelor’s, master’s, or doctor’s 
degrees. 
            
Justice Wainwright would permit 
partial state regulation of a single word—“degree”—while allowing an institution 
to represent that its diplomas are indistinguishable 
from valid degrees. A graduate of one of these unaccredited institutions may now 
proudly display a framed diploma that says: “ABC Institute has conferred on John 
Doe the designation Doctor of Medicine which is equivalent to a doctoral 
degree.” Justice Wainwright’s 
proposed holding would strip the Board of its ability to regulate institutions 
of higher learning. Diploma mills would stand on equal footing with accredited 
institutions, and consumers would have no assurance that their professor, 
engineer, counselor, or chemist graduated from an institution that satisfied the 
Legislature’s minimum requirements for accreditation. 
IV
Conclusion
 
            
Because the statute permissibly regulates commercial speech, and because it 
presents no Establishment Clause or Free Exercise Clause violation, I 
respectfully dissent from the part of the Court’s judgment that concludes 
otherwise. I would reverse the court of appeals’ judgment relating to the use of 
the term seminary and would render judgment for the petitioners on that issue. I 
would affirm the remainder of the judgment. 
 
______________________________
Wallace B. 
Jefferson
Chief Justice 

 
OPINION 
DELIVERED:     August 31, 
2007                                                           

     
 
 
 







[1] 
I join most of part III-B of the Court’s opinion, but I do not agree with its 
proposition that “[e]ither way, the statute in its 
application to schools offering only religious instruction targets religious 
practices, discriminating between those that comply with state standards from 
those that do not, and is not merely a neutral regulation of post-secondary 
education.”

[2] 
In a footnote, the plurality cites section 61.308(e) and notes the court of 
appeals’ holding that this provision rendered the statutory scheme 
“unobtrusive.” ___ S.W.3d at ___. The plurality brushes 
this section aside because “[t]he Coordinating Board has not made that argument 
in its briefs in this Court, and has not cited section 61.308(e), although it 
did cite a corresponding regulation . . . and pointed out in oral argument that 
because HEB Ministries has never been evaluated by the State, there has never 
been an opportunity for ‘any court . . . to see if there is indeed a conflict 
between any of [the State’s] requirements and [HEB Ministries’] religious 
beliefs or practice.’” The plurality also notes that “[t]he Board stops short of 
saying that it would have – or even could have – offered any special allowances 
for religious institutions.” Regardless of the Coordinating Board’s contentions 
or citations, we may no more ignore this exemption for religious institutions 
than we may disregard unmentioned, but controlling, precedent. 
 

[3] 
The current regulations contain a similar provision:
 
The Board shall consider the application of any 
accreditation standard that prohibits accreditation of an institution solely on 
the basis of religious policies practiced by the institution as sufficient 
justification for extending the institution's eligibility for certification to 
grant degrees of a religious nature only, if the institution:
(A)          
has applied for and pursued accreditation in good 
faith;
(B)           
meets all other standards at the level of accreditation; and
(C) satisfies all other 
requirements of the Board.
19 Tex. Admin. Code § 7.6 (c) (5) 
(2007).

[4] 
As Respondents assert, “[i]f these statutes are held 
to violate the Establishment Clause, a blanket exemption would be required for 
all religious institutions.” 

[5] 
494 U.S. 872(1990).

[6] 
508 U.S. 520 (1993)

[7] 
Shelton 
College, 448 A.2d at 993.

[8] 
Here, as Justice Wainwright 
notes, there is no doubt that the State is free to regulate postsecondary 
education, and thus may regulate the issuance of degrees (and degree-like 
documents) even by those who are religiously impelled to issue them. 

[9] 
Smith, 494 U.S. at 
882(“There being no contention that Oregon's drug law represents an attempt to 
regulate . . . the communication of religious beliefs . . .”). 
 

[10] Cantwell v. Connecticut, 310 U.S. 296, 
304-307 (1940).

[11] Murdock v. Pennsylvania, 319 U.S. 105 (1943); 
); Follett v. McCormick, 321 U.S. 573 (1944); see also Swaggart, 493 U.S. at 387 (discussing 
Murdock and Follett and observing that “[s]ignificantly, we noted in both cases that a primary vice of 
the ordinances at issue was that they operated as prior restraints of 
constitutionally protected conduct.”). 

[12] The plurality attempts to substantiate its 
characterization by the following reasoning: “[S]ection 61.304 strongly encourages compliance with state 
educational standards, which in turn affect the content and operation of 
religious educational programs, and in that sense . . . affects ‘the 
communication of religious beliefs’ . . .” ___ S.W.3d at ___ (citations 
omitted). As discussed above, the Supreme Court requires a much more direct 
regulatory relationship to trigger the higher level of scrutiny applied by the 
plurality. In any case, if forbidding religious schools from falsely 
representing themselves as meeting the State’s neutral, otherwise valid 
educational standards has a negative impact on those schools’ enrollment (and 
thus on their ability to communicate with students), this would seem merely to 
be evidence of a preference among potential students for a different type of 
education, or, at least, for a graduation document that can be passed off as 
evidence of one. Even a church cannot boost attendance by advertising a raffle 
and misrepresenting the prize.

[13] The Board assessed a $5,000 penalty for 
each of the thirty-four violations. Twenty-six of the thirty-four violations 
involved associate, bachelor, master, and doctoral degrees.

[14] An absolute adjective is one “having its 
noun understood, not expressed, as poor in The poor are always with us.” Random House Unabridged 
Dictionary 7 (2d ed. 1993). One need not say “disease” to further 
describe a person afflicted with “Alzheimer’s.”